Argued and submitted November 2, 2006, reversed and remanded for
reconsideration of denial of permit; otherwise affirmed May 23, 2007

## Robin Deen RICHARDSON,
### *Petitioner,*

*v.*

## DRIVER AND MOTOR VEHICLE
## SERVICES DIVISION (DMV),
## a division of the Department of Transportation,
### *Respondent.*

## Department of Transportation
## 120463; A130241

159 P3d 1227

Jossi Davidson argued the cause and filed the briefs for petitioner.

Denise G. Fjordbeck, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Schuman and Ortega, Judges.

LANDAU, P. J.

## LANDAU, P. J.

The Driver and Motor Vehicle Services Division of the Oregon Department of Transportation (DMV) cancelled petitioner's driving privileges, denied further driving tests, and denied a request for a permit to take driving lessons. She seeks judicial review, challenging each of those three rulings. We affirm DMV's cancellation of petitioner's driving privileges and its denial of further driving tests, but reverse and remand for reconsideration of its denial of a permit.

## I. BACKGROUND

We begin with a brief description of the statutes and administrative rules that pertain to DMV's authority to regulate driving privileges in this state to provide context for the issues on review. We then follow with a description of the material facts.

### A. *Regulatory framework*

DMV is required to issue a driver license to a person who meets certain eligibility requirements. ORS 807.040. Those statutory eligibility requirements are stated both in positive terms—what a person affirmatively must do to meet the requirements—and in negative terms—what a person may do to render himself or herself *in*eligible. ORS 807.040(1).

Among the former is the requirement that an applicant must successfully pass an examination. ORS 807.070. One of the examination requirements is an "actual demonstration" of a person's ability to "operate a motor vehicle without endangering the safety of persons or property." ORS 807.070(3). Among the latter are certain medical conditions or mental impairments that may render a person ineligible, including a "mental or physical condition that affects the person's ability to safely operate a motor vehicle on the highways." ORS 807.060(5).

In addition, DMV is authorized to cancel driving privileges when it determines that a person once eligible is no longer eligible. That authority is set out in ORS 807.350, which provides, in part:

"(1)   The Department of Transportation, at any time, may cancel the driving privileges or part of the driving privileges granted any person under any class of license or under any endorsement or any driver permit if the department determines that the person no longer meets the qualifications or requirements for the license, endorsement or permit.

"(2)   Upon cancellation under this section, a person whose privileges are canceled shall surrender to the department any license or driver permit issued for the driving privileges. Failure to comply with this subsection is subject to penalty as provided under ORS 809.500.

"(3)   If the department cancels driving privileges under this section, the department may provide for the issuance of a license, driver permit or license with endorsement or limitations granting driving privileges for which the person does qualify or meet the requirements. The department may provide for the waiver of all or part of the fees relating to the issuance of a license or driver permit when the department issues a driver permit or license under this subsection, as the department determines equitable."

Under administrative rules that DMV has adopted to implement ORS 807.350, the agency may request that a person to whom driving privileges have been granted provide proof that he or she remains eligible. OAR 735-074-0170.[1] The agency may do so because it has received a report from a citizen, a police officer, or a medical professional; or it may do so because the driver has advised DMV directly of a medical condition that may impair driving. *Id.* Under those rules, DMV will cancel a person's driving privileges if the agency "determines the person no longer meets the qualifications for a driver license, permit or endorsement because of a physical or mental disability or disease" and may do so immediately if it has reason to believe that permitting the person to continue to drive "may endanger people or property." OAR 735-074-0180(3).

DMV may determine continuing eligibility to drive by means of an examination, including a driving test. The

_____

[1] References to DMV's rules are to the versions in effect at time of the proceeding at issue in this case.

agency may, however, refuse to continue a driving test or conduct further testing if the agency official conducting the test "reasonably believes that the person is likely to endanger persons or property" while being tested. OAR 735-062-0073(3). Specific reasons for immediately stopping a driving test include:

"(a)  An accident during the drive test which could have been avoided by the driver being tested;

"(b)  Dangerous driving behaviors including but not limited to the following:

"(A)  Failure to obey traffic control devices;

"(B)  Is prevented from causing an accident by the actions of other drivers or the examiner;

"(C)  Turns from the wrong lane or into the wrong lane in a way that it impedes the right of way of others;

"(D)  Fails to stop for a school bus that has its red lights flashing;

"(E)  Fails to yield to a pedestrian or fails to stop when another vehicle is stopped at a crosswalk because a person is occupying the crosswalk;

"(F)  Drives over a curb, sidewalk or median;

"(G)  Depends on the action of other drivers for his or her own safety; or

"(H)  Changes lanes or merges into traffic without checking for other vehicles.

"(c)  Is an experienced driver who is unable to perform basic driving tasks;

"(d)  Is unable to follow instructions to the point the drive examiner is not certain he or she can verbally guide the driver back to the DMV field office; or

"(e)  Seems unaware of driving mistakes made, takes no responsibility as mistakes are pointed out and shows a pattern of denial of any error."

OAR 735-062-0073(3). The same reasons may justify denial of further testing, as well. OAR 735-062-0073(4).

A person whose driving privileges have been canceled may reapply to DMV and establish his or her qualifications. ORS 807.350(4). If a person's driving privileges have been canceled and DMV has denied further testing, the agency's administrative rules also provide that the person may reapply:

"Someone who has been denied further testing under this rule must provide adequate proof to DMV that the person has taken steps to improve driving skills and as such can take a drive test without endangering the safety of persons or property. A person may provide proof, which may alone or in conjunction with other information constitute adequate proof, such as the following:

"(a) Successfully complete a driver training course conducted by an [Oregon Department of Transportation] certified commercial driver training school and submits proof of completion to DMV.

"(b) Successfully complete a driver rehabilitation program conducted by a rehabilitation specialist and submits proof of completion to DMV."

OAR 735-062-0073(6).

A person whose driving privileges have been cancelled is entitled to a contested case hearing. OAR 735-076-0060. A person then may seek judicial review in this court. ORS 183.482.

B. *Facts*

We take the following undisputed facts from the record and DMV's order. In late 1996, DMV received information that petitioner had a medical condition that affected her ability to safely operate a motor vehicle on the highway. The agency informed her that, in order to retain her driving privileges, petitioner was required to enroll in its medical certification program, to submit yearly certificates of medical eligibility, and to take periodic vision, written, and driving tests. *See* ORS 807.090 (providing for State Health Officer certification of eligibility for driving privileges of persons having mental or physical impairment or condition); OAR 735-074-0170 (same). Between February 1997 and January 2005, petitioner submitted seven such certificates. She also

took, and passed, driving tests in March 1997 and October 2002. Between August 1998 and the cancellation of driving privileges at issue in this case, petitioner drove her car on a daily basis in both rural and urban areas; during that time, she was never cited for a traffic offense and was not involved in any vehicle-related accidents.

In 2005, DMV again required petitioner to take and pass a driving test. Petitioner took and failed a test on January 5. The examiner's written report for the test indicated that, among other things, petitioner made an unnecessary stop at a green light on a freeway on-ramp and failed to check her blind spots before changing lanes.

On January 19, 2005, petitioner took another driving test. The test was administered by a different examiner. She once again failed because, among other things, she once again failed to check her blind spots before changing lanes, failed to follow crosswalk laws, made wide turns, turned from an improper lane, and failed to check her blind spots when backing up.

On February 2, 2005, petitioner took a third driving test. The test was conducted by the same examiner who had conducted her January 5 test. The examiner told petitioner that she could have another examiner if she preferred, but she declined. During the test, petitioner became "nervous, upset, scared, and angry" because of what she thought was unnecessary shouting of instructions by the examiner. During the examination, petitioner repeated some of the errors that she had made before. She failed to check her blind spots before changing lanes, failed to obey the crosswalk law, and made a late stop. The examiner eventually directed petitioner to a two-lane freeway on-ramp controlled by access signals. Petitioner "rolled" through a red light while a vehicle that had the right of way was forced to slow down in order to avoid a collision with petitioner's vehicle.

At the conclusion of the test, the examiner informed petitioner that she had failed, that she would not be offered any further tests, and that she should surrender her driver license because her driving privileges would be suspended on February 11. Petitioner stated that she would turn her

license in by February 11. The examiner then took the license from petitioner's hand. Words were exchanged, after which the examiner got out of petitioner's vehicle. In his written report, the examiner summarized petitioner's driving errors and, on the line relating to "Further Testing Denied," indicated "Yes."

On February 15, 2005, DMV issued a "Notice of Cancellation" in which it informed petitioner that she no longer met the requirements for an Oregon driver license or permit, that "further testing may endanger the safety of persons or property," and that her Oregon driving privileges were canceled as of March 17, 2005. Petitioner requested a hearing on the cancellation and, in a separate request, on DMV's subsequent refusal to grant her a permit to attend driving school.

On March 15, 2005, DMV manager Hampton reviewed petitioner's file in regard to whether petitioner should be denied further testing and whether her driving privileges should be canceled. Hampton concluded that information in the file supported the examiner's recommendation to deny further testing and the cancellation of her driving privileges. According to Hampton, "It is clear that [petitioner] no longer meets the minimum requirements for driving privileges."

A contested case hearing was held on April 28, 2005, before an administrative law judge (ALJ) of the Office of Administrative Hearings. DMV's case consisted of a number of exhibits relating to petitioner's driving history, including the written report of petitioner's February 2 driving test. The report stated, in part, that petitioner "went right through a red light at a freeway on ramp meter," that she "failed to recognize" that there was a car "parallel to us as we went down the narrowing on ramp," and that the other car ultimately "had to slow down (even though it had the right of way) in order to not be hit or forced off the road" by petitioner's vehicle. As noted above, the report also contained the examiner's recommendation that petitioner be denied further testing.

Petitioner presented written information and testimony from persons regarding her driving skills. One witness testified that she knew petitioner from church, that she had

permitted her daughter to ride in petitioner's car on various occasions, and that she had never observed anything inappropriate about petitioner's behavior or temperament. A second witness testified that she was a registered nurse, that she had ridden as a passenger in petitioner's car, and that, while doing so, she had had no concerns for the safety of herself, other persons, or property; she characterized petitioner as a "very good driver." Petitioner's mother testified that she frequently rode in petitioner's vehicle and that petitioner was a "regular normal driver" whose driving had not endangered other people and who had no judgment-related or behavioral issues that affected her ability to safely operate a vehicle.

In her own testimony, petitioner explained that the incident in late 1996 that led to her placement in the medical certification program in 1997 did not result in any official charges or sanction. She testified that, in 1997, she pleaded guilty to a charge of driving under the influence of intoxicants (DUII), that she subsequently underwent outpatient alcohol treatment, and that she attended AA meetings; she testified that she had consumed alcohol in approximately August 2002 and again in April 2004, but had not done so since that time. She testified that she had been diagnosed 10 years earlier as suffering from bipolar disorder and that, since that time, she has taken medication for that condition as well as medication for depression, and that she regularly meets with her mental health practitioners. She also testified that, since 1997, she has not received any traffic citations and has not been involved in any traffic accidents or arguments with other drivers.

As to her three most recent driving tests, petitioner testified that, in the first test, the examiner was "arrogant," "condescending," and "very intimidating," and made her "very nervous." She described having the same examiner again for her third test; she stated that he "screamed at [her] like a drill sergeant" and that she was "nervous, scared, upset, angry." She also testified that, during the third test, she believed that she had stopped at the red light on the freeway on-ramp; she conceded that she had not seen the vehicle in the next lane. She also described the incident in which the examiner took her driver license from her hand and her response. She testified that the examiner did not tell her at

that time that she could not take another test and that a driving school that she later contacted first informed her that DMV had declined to issue her a permit for taking driving lessons.

At the close of the hearing, petitioner argued that a preponderance of the evidence—including witness testimony regarding her driving skills and habits and the lack of tickets or accidents on her driving record—demonstrated that she did not meet the criteria for cancellation, notwithstanding her mistakes and verbal outburst after the February 2, 2005, driving test. Petitioner also argued that DMV improperly denied further testing. Finally, petitioner argued that there was no evidentiary justification for her to continue to be subject to the medical certification program, specifically, that, notwithstanding her history of bipolar disorder and alcoholism, there was no evidence of severe functional or cognitive impairment.

In his final order on behalf of DMV, the ALJ identified the issues as whether petitioner met the qualifications of requirements for a driver license under ORS 807.040, ORS 807.060, and ORS 807.070; and whether DMV was authorized to cancel her driving privileges under ORS 807.350 and ORS 809.310(1). The ALJ made factual findings relating to petitioner's placement in the medical certification program and her January 5, January 19, and February 2, 2005, driving tests. As pertinent here, the ALJ also found that, in her February 2 test, among other errors, petitioner "rolled through" a red light and failed to realize that there was another vehicle next to her, forcing the other car to slow down to avoid a collision or being forced off the road. The ALJ also found as fact that petitioner had not submitted "proof" that she was able safely to operate a motor vehicle. The ALJ concluded that petitioner did not meet the qualifications of requirements for a driver license under ORS 807.040, ORS 807.060, and ORS 807 070; and that DMV was authorized to cancel her driving privileges under ORS 807.350 and ORS 809.310(1).

The ALJ reasoned that the record showed that petitioner "committed numerous acts of dangerous driving behavior during the three drive tests that she failed," acts,

the ALJ noted, that are specifically enumerated in OAR 735-062-0073(3) as grounds for immediately stopping a driving test, including the ground that a tested driver "[s]eems unaware of driving mistakes made, takes no responsibility as mistakes are pointed out and shows a pattern of denial of any error"—a criterion that the ALJ reasoned petitioner had met by disputing the examiner's narrative of events. The ALJ also noted petitioner's own testimony regarding her mental state—that she was nervous, upset, scared, and angry—and the poor judgment she displayed in her outburst toward the examiner; the ALJ reasoned that those "traits" were inconsistent with safe driving. The ALJ also determined that it was "objectively reasonable" to deny further testing based on petitioner's poor performance in the three driving tests, her "demonstrated inability to control her anger and/or frustration," and her continued enrollment in the medical certification program. The ALJ found no facts to support petitioner's "surmise" that the examiner's report of her driving test was based on a desire to retaliate for her outburst.

In addition, the ALJ reasoned that, as a matter of law, running a red light on a freeway on-ramp was the equivalent of running a red light in any other context; and that, although petitioner had a nine-year record of no accidents or citations, the three recent tests were intended to evaluate her current ability to drive safely. As to whether petitioner properly was subject to the medical certification program, the ALJ explained that that decision was within the authority of the State Health Officer or his or her designee. The ALJ also noted that there was evidence in the record that petitioner had not followed the instructions of one of her health care providers in regard to operating a vehicle after taking a medication. Finally, the ALJ explained that petitioner's evidence relating to the negative consequences of cancellation of her driver license was, in effect, irrelevant to the validity, under the applicable statutes and rules, of the cancellation. As noted, the ALJ affirmed the cancellation.

## II.  ANALYSIS

On judicial review, petitioner argues that DMV erred in canceling her driving privileges, denying her further driving tests, and denying her a permit to take driving

lessons. We address each of those arguments in turn. Because, as we have noted, there is no dispute as to the facts, we review DMV's decisions with respect to those issues for substantial reason and errors of law. ORS 183.482(8); *Nakashima v. Board of Education*, 204 Or App 535, 538, 131 P3d 749, *adh'd to on recons*, 206 Or App 568, 138 P3d 854, *rev allowed*, 342 Or 116 (2006).

A. *First assignment: Cancellation of driving privileges*

■ In her first assignment of error, petitioner argues that DMV erred in canceling her driving privileges. As we understand petitioner's arguments, there are two reasons for her assertion that DMV erred. First, she contends that the statutes and administrative rules that authorize DMV to cancel driving privileges are unconstitutionally vague in that they impart no discernible standard for DMV to apply and permit the agency to cancel driving privileges for arbitrary reasons. Second, she argues that, in any event, DMV's application of the relevant statutory and regulatory standards in this case lacks substantial reason: "The permanent loss of driving privileges imposed on petitioner in this case for committing one or two minor traffic infractions is more severe than the eight or ten year period of revocation that she would receive if she committed murder with her vehicle."

DMV argues that the applicable statutes and administrative rules adequately specify the standards for determining whether it may cancel driving privileges. It further contends that its order adequately specifies petitioner's multiple infractions during her three driving examinations and connects those infractions with the conclusion that she should not be permitted to continue to drive.

■ We begin with petitioner's contention that the statutory and administrative standards for cancellation are unconstitutionally vague. As we noted in *State v. Krueger*,

> "to say that a law is unconstitutionally 'vague' can refer to any of three different problems. First, a statute may be so vaguely crafted as to permit arbitrary or unequal application and uncontrolled discretion, in violation of Article I, sections 20 and 21, of the Oregon Constitution. Second, a statute may create an 'unlawful delegation issue' under the Due Process Clause of the Fourteenth Amendment in that

it contains no identifiable standards or employs standards that rely on the 'shifting and subjective judgments of the persons who are charged with enforcing it.' Third, a statute may be so poorly written as to fail to provide 'fair warning' of the conduct that it prohibits, in violation of the Due Process Clause."

208 Or App 166, 170-71, 144 P3d 1007 (2006) (quoting *State v. Illig-Renn*, 341 Or 228, 142 P3d 62 (2006)). In this case, petitioner's vagueness challenge is of the first sort.

In *State v. Graves*, 299 Or 189, 195, 700 P2d 244 (1985), the Supreme Court explained in a criminal case that a statute "must not be so vague as to permit a judge or jury to exercise uncontrolled discretion." Among other things, the court noted that standards that are impermissibly vague give "unbridled discretion" to decide what is and is not prohibited, resulting in unequal application of the laws in violation of Article I, section 20. *Id.*

In this case, the statutes and regulations are not so vague as to permit DMV uncontrolled discretion. As we have noted, under ORS 807.060(5), a person is ineligible for driving privileges if DMV "reasonably believes" that the person "has a mental or physical condition or impairment that affects the person's ability to safely operate a motor vehicle upon the highways." ORS 807.070(3) provides that the required examination for a driver license includes a driving test, that is, "an actual demonstration of the applicant's ability to operate a motor vehicle without endangering the safety of persons or property."

DMV's administrative rules further specify the grounds for determining that a person cannot operate a motor vehicle without endangering the safety of persons or property. Specifically, OAR 735-062-0073 lists, among other things, a failure to obey traffic control devices, changing lanes without checking for other vehicles, inability to follow instructions from the examiner, and lack of awareness—or denial—of driving mistakes, all of which the examiner observed of petitioner.

The statutes and applicable regulations thus reasonably cabin any agency discretion in carrying out DMV's

authority. We reject petitioner's vagueness challenge without further discussion.

■    Petitioner's alternative argument is that, in any event, DMV's decision to cancel her driving privileges lacks substantial reason. According to petitioner, DMV's decision to cancel is unreasonable because the cancellation of those privileges for mere traffic infractions committed during an examination is more severe than the penalty for committing more serious offenses.

In reviewing an agency decision for "substantial reason," the determinative issue is whether the agency states its factual findings and articulates a rational connection between the facts it finds and the legal conclusions it draws from them. *Drew v. PSRB*, 322 Or 491, 500, 909 P2d 1211 (1996); *see also Goin v. Employment Dept.*, 203 Or App 758, 763, 126 P3d 734 (2006) ("Our substantial reason review requires a determination of whether [an agency's] findings of fact logically lead to its conclusions of law.").

In this case, DMV made specific findings regarding driving errors made by petitioner in her three recent driving tests. Specifically, DMV found—and petitioner does not dispute the findings—that she stopped at a green light at a freeway on-ramp, failed to check her vehicle's blind spots before changing lanes, failed to follow crosswalk laws, made wide turns, turned from an improper lane, failed to check her blind spots when backing up, and drove through a red light on a freeway on-ramp.

Based on those findings, DMV concluded that petitioner met the criteria in OAR 735-062-0073(3) for stopping a driving test, *viz.*, "dangerous driving behaviors," including failure to obey traffic control devices, changing lanes without checking for other vehicles, and inability to follow instructions. DMV also concluded that petitioner's error in running a red light on a freeway on-ramp "exhibited driving that was likely to endanger persons or property," that is, that she failed to meet the examination requirement that she "operate a motor vehicle without endangering the safety of persons or property" as required under ORS 807.070(3). In so doing, DMV provided a sufficient explanation connecting the facts

to its conclusion that petitioner failed to meet the qualifications or requirements for driving privileges established under ORS 807.040 and ORS 807.070 and that it was authorized under ORS 807.350 to cancel those privileges.

Plaintiff's argument appears not so much to attack the connection between DMV's findings and its conclusions as to attack the underlying statutory and regulatory provisions that authorize the "permanent loss of driving privileges" for what petitioner characterizes as "minor traffic infractions," while requiring lesser sanctions for more severe offenses. In a sense, petitioner's is a sort of "proportionality" challenge to the statutory scheme. We need not address that challenge, however, because it rests on a false premise, namely, that the statutes and regulations require a "permanent loss of driving privileges." They do not. As we have noted, under ORS 807.350(4), a person whose driving privileges have been cancelled may reapply for the privilege and establish his or her eligibility and qualification for driving privileges, as provided by law. We therefore reject petitioner's first assignment of error.

B. *Second assignment: denial of further testing*

In her second assignment of error, petitioner argues that DMV erred in denying her the ability to take a fourth driving test. She advances essentially three arguments in support of that assignment. First, she argues, DMV did not establish what she characterizes as a *"prima facie* case" for denial of further testing. According to petitioner, while the applicable administrative rules provide that further testing may be denied only if a person is *likely* to endanger others during subsequent testing, DMV's order determined only that she *may* endanger others during subsequent testing.[2]

---

[2] In arguing that DMV failed to make a *prima facie* case for denial of further testing, petitioner also argues that DMV erred procedurally by imposing that denial in February 2005, before conducting the required managerial review. As described above, however, DMV's February 15, 2005, communication to petitioner was a notice of proposed action. DMV issued its final order in the case in June 2005, that is, after DMV manager Hampton reviewed petitioner's file in March 2005 and after the April 2005 hearing. We therefore reject petitioner's procedural challenge without further discussion.

Second, she argues, the applicable administrative rules provide no meaningful standards for determining whether further testing would likely pose a danger to others. And third, she argues, substantial evidence is lacking to support DMV's conclusion that further testing actually would pose a danger to others; according to petitioner, her past history of driving without so much as a traffic citation contradicts DMV's determination that further testing poses a danger to anyone.

DMV argues in response that petitioner failed to preserve the issue for judicial review. On the merits, the agency first argues that, although it did not expressly determine in its final order that petitioner was "likely to endanger persons or property," its determinations in the opinion section of the order that petitioner is a "dangerous driver" and that she "committed numerous acts of dangerous driving behavior" during her tests were sufficient determinations that petitioner met the "likely to endanger" standard for denial of further testing. Responding to petitioner's argument about the lack of meaningful standards, DMV argues that OAR 735-062-0073 provides an adequate list of circumstances and conduct that justify stopping a test or denying further testing. As for petitioner's argument that DMV erred in determining that she was a dangerous driver, the agency argues that its findings more than adequately substantiate the conclusion and that the record supports its findings.

As an initial matter, we reject the agency's argument that petitioner failed to preserve the issue whether DMV erred in denying further testing. At the hearing, at the close of DMV's case, petitioner's counsel expressly argued that DMV had not met its evidentiary burden with respect to further testing, cancellation of her driving privileges, and the denial of a permit that would allow her to take driving lessons. At the conclusion of the hearing, counsel again asserted that DMV had not shown that petitioner was likely to endanger persons or property. Although DMV did not include any ruling on that issue in the "conclusions" section of its final order, it found as fact that the examiner at petitioner's February 2 driving test "recommended that further testing be denied" and, in the opinion section of the order, noted that OAR 735-062-0073 sets out standards for stopping a driving test or denying further testing and noted that the record

included facts that "constituted grounds to immediately stop a [driving] test." DMV reasoned that, under the totality of the circumstances—including "[p]etitioner's poor performance on three drive tests," her continued enrollment in the medical certification program, and her "demonstrated inability to control her anger and/or frustration"—Hampton's "decision to support the examiner's decision to deny further tests" was "objectively reasonable." Thus, notwithstanding petitioner's failure to separately request a hearing on that issue, it was both raised by petitioner and addressed by DMV. *Cf. Gray v. Western Panel Mfg*, 163 Or App 151, 155-56, 986 P2d 1249 (1999) (agency made factual findings but listed them in "Conclusions of Law and Opinion" section of final order; although "basis for the order would have been clearer" if factual findings had been set out as such, order did not violate ORS 183.470, requiring final orders to be "accompanied by findings of fact and conclusions of law"). The assignment is preserved.

■       We turn to the parties' arguments on the merits. We begin with petitioner's argument that DMV failed to apply the proper standard in denying further testing, namely, that further testing is *likely* to endanger others. As we have noted, OAR 735-062-0073(3) authorizes an examiner to stop a driving test if the examiner "reasonably believes the person is likely to endanger persons or property." The rule specifies a number of factors that are relevant to the determination that a person is likely to constitute a danger, including dangerous driving behavior, failure to obey traffic control devices, and seeming unaware of driving mistakes made. OAR 735-062-0073(3)(b) and (e). OAR 735-062-0073(4) then provides that those same considerations, among others, may justify an examiner recommendation of denial of further testing. OAR 735-062-0073(5) provides for DMV review of that recommendation.

In this case, in the opinion section of its final order, DMV noted that the "guidelines" both for stopping a test and for recommending the denial of further testing are set out in OAR 735-062-0073, that the record showed that petitioner had "committed numerous acts of dangerous driving behavior," and that those acts were "specifically listed in the rule."

After describing petitioner's driving errors and what it characterized as petitioner's "poor judgment" in reacting to the examiner, DMV noted that manager Hampton had concluded that information in the file supported the driving test examiner's recommendation to deny further testing and concluded that "[Hampton's] decision to support the examiner's decision to deny further tests" was "objectively reasonable." Read in its entirety, and particularly in light of the references to OAR 735-062-0073, which establishes the standard, DMV's final order demonstrates that, in denying petitioner further testing, it applied the correct standard.

Petitioner's alternative contention—that the standard itself provides insufficient guidance to DMV—we may reject with minimal discussion. As we have noted, OAR 735-062-0073(3) authorizes an examiner to stop the driving test of a person when the examiner "reasonably believes the person is likely to endanger persons or property" and enumerates specific factors that are relevant to that standard, including the "dangerous driving behavior[ ]" of "[f]ailure to obey traffic control devices," OAR 735-062-0073(3)(b)(A), and seeming "unaware of driving mistakes made," OAR 735-062-0073(3)(e). Under OAR 735-062-0073(4) and (5), those factors also are relevant to an examiner's recommendation to deny further testing and to DMV's review of that recommendation. Even without the additional factor set out in OAR 735-074-0180(4)(c)—relating to the existence of "a physical or mental condition that affects [a driver's] ability to safely operate a motor vehicle"—the "likely to endanger persons or property" standard is sufficiently guided.

We turn to petitioner's third argument in support of the assignment, that DMV erred in determining that further testing in fact was likely to endanger other persons or property. The argument is essentially that DMV's finding as to the likelihood of danger is not supported by substantial evidence. She argues that the "substantial weight" of the evidence, when her prior driving record is taken into account, demonstrates that further testing posed no danger and that the examiner had merely "overreacted" to minor traffic infractions.

"Substantial evidence" to support a finding of fact exists when the record, viewed as a whole, "would permit a reasonable person to make a finding." ORS 183.482(8)(c). In this case, notwithstanding petitioner's evidence of prior accident- and infraction-free driving and witness testimony as to petitioner's driving ability, substantial evidence supports DMV's determination that the standard was met here, including evidence of petitioner's driving errors and her lack of awareness of those errors. *See Garcia v. Boise Cascade Corp.*, 309 Or 292, 295, 787 P2d 884 (1990) ("If a finding is reasonable in light of countervailing as well as supporting evidence, the finding is supported by substantial evidence."). DMV did not err as asserted in denying further testing.

C. *Third assignment: Refusal to issue a permit*

■ In her final assignment of error, petitioner argues that DMV erred in refusing to issue a permit so that she can take driving lessons and, at some time in the future, reapply as the law allows. Petitioner contends that OAR 735-062-0073(6) expressly provides that a person who has been denied further testing must provide adequate proof that the person has taken steps to improve his or her driving skills and that DMV has arbitrarily precluded her from doing just that. According to petitioner, DMV has taken a position worthy of a Kafka novel—"you can take another driving test if you complete driving lessons, [but] we won't give you a permit to take driving lessons." DMV contends that it has discretion to deny permission to take driving lessons and that, under the circumstances, it has not abused that discretion.

Again, ORS 807.350(3) provides that, if DMV cancels a person's driving privileges, it "may provide for the issuance of a license, driver permit or license with endorsement or limitations granting driving privileges for which the person does qualify or meet the requirements." Thus, DMV is correct in contending that the statute confers on the agency discretion to grant or deny a limited license or permit.

At the same time, the applicable statutes and rules do provide mechanisms for drivers to attempt to meet previously unmet qualifications and requirements. As petitioner correctly contends, OAR 735-062-0073(6) expressly provides that someone who has been denied further testing can obtain

further testing upon successful completion of a driver training course or a driver rehabilitation program.

In this case, DMV's final order does not explain why such further driver training or driver rehabilitation should not be made available to petitioner. The order, in fact, does not address the matter at all. We therefore reverse and remand for reconsideration of that issue. *Jones v. Employment Dept.*, 199 Or App 571, 575-76, 112 P3d 453 (2005) (where agency failed to explain how person's conduct and other circumstances met applicable legal standard, court reversed and remanded for reconsideration).

Reversed and remanded for reconsideration of denial of permit; otherwise affirmed.